**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**LINDA D. PARSONS,**

      **Plaintiff,**

**v.**                             **Case No.: 3:18-cv-01107**

**NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 9, 11).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Brief in Support of Judgment on the Pleadings be **DENIED**; the Commissioner's request for

judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.  <u>Procedural History</u>

On October 20, 2014, Plaintiff Linda Parsons ("Claimant") completed applications for DIB and SSI, alleging a disability onset date of August 17, 2006 due to "[a]rthritis, tennis elbow, back injury, depression." (Tr. at 234, 240, 262). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 135-44, 152-65). Claimant then filed a request for an administrative hearing, which was held on May 9, 2017 before the Honorable Laura Bernasconi, Administrative Law Judge. (Tr. at 35-72). At the hearing, the ALJ noted that Claimant had previously filed an application for DIB, which was denied by the SSA on January 20, 2011 and was not appealed. (Tr. at 10). The ALJ determined that a motion to reopen the prior application was untimely; therefore, she amended the disability onset date to January 21, 2011—one day after the previously adjudicated period. (*Id.*). By written decision dated June 8, 2017, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 10-22). The ALJ's decision became the final decision of the Commissioner on April 30, 2018 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 7, 8). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 9), and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 11). Consequently, the matter is fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 36 years old on her alleged onset date, 41 years old on her date last insured, and 47 years old on the date of the ALJ's decision. (Tr. at 257). She has a high school education and communicates in English. (Tr. at 261, 263). Claimant previously worked as an adopter/cleaner at an animal shelter, a cashier, dispatcher, kitchen aide, and service desk cashier. (Tr. at 263).

## III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A

severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the

4

ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2011. (Tr. at 12, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since August 17, 2006. (Tr. at 12-13, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "osteoarthritis of the back and knees, obesity, chronic obstructive pulmonary disorder, depression, anxiety and hypothyroidism." (Tr. at 13, Finding No. 3). The ALJ also considered Claimant's eczema, iron deficiency, and headaches, but concluded that these impairments were non-severe. (Tr. at 13).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 14-15, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work. She can perform occasional climbing of ramps and stairs. She can never climb ladders, ropes, and scaffolds. She can occasionally perform balancing, stooping, kneeling, crouching, and crawling. She can perform occasional reaching in front of her, laterally and overhead, bilaterally. She must avoid concentrated exposure to extreme cold, heat, vibration, and hazards such as machinery and heights. She can perform simple, repetitive tasks.

(Tr. at 15-19, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform any of her past relevant work. (Tr. at 19-20, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in other substantial gainful activity. (Tr. at 20-21, Finding Nos. 7-10).

The ALJ considered that (1) Claimant was born in 1970 and was defined as a younger individual on the alleged disability onset date; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of her transferable job skills. (Tr. at 20, Finding Nos. 7-9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including unskilled light-level work as a product inspector or a counter clerk. (Tr. at 20-21, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 21-22, Finding No. 11).

## IV.   **Claimant's Challenge to the Commissioner's Decision**

Claimant raises a number of challenges to the Commissioner's decision. First, Claimant argues that the ALJ erred by only assigning "partial weight" to the opinion of Rakesh Wahi, M.D., who performed a consultative examination of Claimant. (ECF No. 9 at 5). Claimant notes that Dr. Wahi stated that Claimant suffers from both arthritis and possible acromegaly. (*Id.*). Next, Claimant faults the ALJ for failing to state what weight she assigned to the opinion of Robert Holley, M.D., another consultative examiner. (*Id.*). Claimant again points out that the examining physician diagnosed a number of impairments. (*Id.*). Claimant argues that the ALJ also provided inadequate analysis by failing to state what weight she gave to the opinion of William C. Steinhoff, M.A., who performed a psychological consultative examination of Claimant. (*Id.* at 5-6). Furthermore, Claimant believes that the ALJ erred again by failing to assign weight to the opinion of Catherine Van Verth Sayre, M.A., yet another consultative examiner. (ECF No.

9 at 6). Claimant contends that as a result of this failure to properly consider various medical opinions, Claimant's RFC did not include all of her limitations and was thus "fatally flawed." (*Id.*).

Claimant additionally argues that the ALJ's determination that Claimant's statements were not entirely consistent with the record was erroneous "in light of the evidence of record." (*Id.*). Finally, Claimant argues that "a fair review of the evidence" conclusively demonstrates that Claimant is entirely precluded from participating in gainful employment. (*Id.*).

The Commissioner contests Claimant's allegation that the ALJ erred in her assessment of Dr. Wahi's opinion, asserting that the ALJ carefully considered the consistency of Dr. Wahi's findings with the other evidence of record and appropriately assigned the opinion partial weight. (ECF No. 11 at 11-12). With respect to the other medical source statements that Claimant contends were given inadequate consideration, the Commissioner maintains that they contained only medical "findings" not "medical opinions" and, consequently, the ALJ was not required to assign them weight. (*Id.* at 14). An added weakness of Claimant's arguments, according to the Commissioner, is that Claimant merely points to the fact that the "opinions" contain certain diagnoses in support of her assertions and does not describe how these diagnoses imposed any specific functional limitations. (*Id.* at 16-17). Finally, the Commissioner characterizes Claimant's position that the ALJ's decision was not supported by substantial evidence as "underdeveloped," and argues that the ALJ considered the evidence at length and reached a determination supported by substantial evidence. (*Id.* at 17-18).

## V.    <u>Relevant Evidence</u>

The undersigned has reviewed all of the evidence before the Court. The following

evidence is most relevant to the issues in dispute.

### A. Treatment Records

On March 26, 2009, Claimant was seen by Stephen Serfontein, M.D., for depression onset, as well as dermatophytosis of the foot. (Tr. at 406). Claimant was feeling depressed due to the recent death of her husband. (*Id.*). Dr. Serfontein diagnosed Claimant with depression, but documented normal findings on Claimant's physical and mental examination. (Tr. at 406-07). Claimant returned on May 8, 2009 and again displayed normal findings on physical and mental examination. (Tr. at 404-05).

On August 6, 2009, Claimant presented to Prestera Mental Health Center for an initial psychiatric evaluation conducted by Lisa Kearns, CNS. (Tr. at 361-65). Claimant revealed that her husband had recently died, and she was facing difficulties involving her children, including the fact that one of her sons had recently had his leg amputated after an All-Terrain Vehicle accident. (Tr. at 361). Claimant's mood was assessed as depressed, anxious, angry, and irritable. She had a fairly reactive affect and displayed impairment in attention and concentration. (Tr. at 363). Claimant was given a Global Assessment of Functioning ("GAF") score of 55.[1] (Tr. at 364). She was prescribed Prozac for depression and anxiety. (*Id.*).

Claimant continued treatment with Dr. Serfontein into February 2010. (Tr. at 393-94). During that time, mental and physical examinations returned largely benign results.

---

[1] The Global Assessment of Functioning Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." Diagnostic Statistical Manual of Mental Disorders ("DSM"), Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). In the past, this tool was regularly used by mental health professionals; however, in the DSM-5, the GAF scale was abandoned, in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-at p. 16. Americ. Psych. Assoc, 32 (5th Ed. 2013). GAF scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

(Tr. at 394-402). On October 27, 2009, Dr. Serfontein noted that Claimant had "a history of requesting pain medication," and indicated his suspicion that she had visited a different physician in an attempt to get more pain medicine. (Tr. at 399). Dr. Serfontein continued to schedule appointments with Claimant until January 2011, but she did not attend any of the scheduled visits. (Tr. at 393-94).

In January 2014, Claimant began treatment at Holzer Health Systems, where she saw a number of health care providers. Claimant was seen by Nathan Clark, DPM, on January 17, 2014, for complaints of bilateral foot pruritus and a rash. (Tr. at 388). Claimant told Dr. Clark she was also suffering from pain at night and excessive swelling in both feet. (*Id.*). Dr. Clark recommended foot powder with Lotrisone and a follow-up examination in three to four weeks. (*Id.*). Claimant returned to Dr. Clark on February 20, 2014 with complaints of bilateral arm pain and numbness. (Tr. at 385). Claimant said she would sometimes accidentally drop items due to her condition. (*Id.*). On examination, Claimant displayed a full range of motion of the shoulders and bilateral elbows. (*Id.*). Dr. Clark discussed x-rays of Claimant's elbows, which showed only some early arthritic changes. (*Id.*). Claimant was told the x-ray and physical examinations findings "were not very significant," and that aggressive treatment options were not favored. (*Id.*). Claimant was offered physical therapy treatment, which she declined. (*Id.*).

On April 30, 2015, Claimant was examined by Renuka Kandula, M.D., for a rash on her upper extremities. (Tr. at 433). Claimant exhibited dyspnea at rest, which was not exacerbated by exertion. Her examination revealed otherwise normal mental and physical results. (Tr. at 433-34). Claimant returned on May 8, 2015 and her rash had improved, but had not disappeared. (Tr. at 428). Except for the rash, Claimant's physical examination revealed normal results. (Tr. at 429).

On June 18, 2015, Claimant was seen by Deena Hassuna, M.D., for a follow-up on a positive antinuclear antibodies test and a rash. (Tr. at 516). Claimant reported having pain in her elbows and knees that had been worsening since 2008; she rated her pain as currently a five out of ten on a ten-point pain scale. (*Id.*). A physical examination revealed intact range of motion of the elbows and shoulders, good bilateral hand grip, and a normal gait. Claimant had crepitus in both knees, but no effusion. (Tr. at 517). X-rays of the right elbow showed no fracture, dislocation, or joint effusion. (Tr. at 518). On July 2, 2015, Dr. Hassuna observed similar findings during a physical examination of Claimant. (Tr. at 514). Dr. Hassuna discussed with Claimant laboratory test results that revealed a positive Hepatitis C result. (Tr. at 515).

On September 10, 2015, Claimant was seen by Marc Subik, M.D., following her diagnosis of Hepatitis C. (Tr. at 509). On physical examination, Claimant's extremities were without cyanosis, clubbing, edema, or rash, and she did not display difficulty in moving them. (Tr. at 510). Claimant's lungs were clear to auscultation. (*Id.*). Dr. Subik diagnosed Claimant with chronic viral Hepatitis C. (Tr. at 511). As Claimant's liver function tests ("LFTs") were normal, Dr. Subik believed there was "no urgency for any treatment." (*Id.*).

On October 2, 2015, Claimant was seen by Dr. Clark for evaluation of painful blisters on the right foot. (Tr. at 503). Several x-rays were taken of Claimant's left shoulder due to a history of shoulder pain, and Dr. Clark believed they revealed only normal results. (*Id.*). Dr. Clark prescribed a topical steroid cream, which resulted in significant improvement of Claimant's blisters by October 23, 2015. (Tr. at 501, 504).

On January 21, 2016, Claimant was seen by Dr. Kandula following three months of laboratory tests. (Tr. at 496). Claimant's iron profile was now normal, so Dr. Kandula

reduced Claimant's intake to one iron pill a day. (*Id.*). Claimant was diagnosed with hypothyroidism but displayed no cold intolerance, constipation, dry skin, or weight gain. Thyroid-stimulating hormone ("THS") tests revealed normal THS levels. (*Id.*). On physical examination, Claimant did not exhibit increased effort in breathing or respiratory distress, and she was clear to auscultation bilaterally. (*Id.*). She had no edema of the lower extremities. (*Id.*). Dr. Kandula's diagnoses included hypothyroidism, nicotine dependence, chronic viral Hepatitis C, and obesity. (Tr. at 497-98).

On August 26, 2016, Claimant returned to Dr. Kandula for a follow-up appointment. (Tr. at 492). Claimant reported that her current pain level was zero, although she continued to experience elbow pain. (*Id.*). Dr. Kandula noted that Claimant's iron deficiency was greatly improved, and she appeared to have more energy. (*Id.*). A physical examination revealed no abnormalities. (Tr. at 492-93). On October 25, 2016, Dr. Kandula noted that Claimant's rash was no longer an issue. (Tr. at 488). Claimant's physical examination again returned normal results. (Tr. at 489). On November 28, 2016, Claimant was seen by Megan Lunsford, FNP, for a follow-up on Hepatitis C treatment. (Tr. at 484). Claimant denied having muscle or joint pain. (Tr. at 485). Her mental state was assessed as appropriate. (Tr. at 484). A physical examination was normal, and Claimant was scheduled for routine follow-up in February 2017. (Tr. at 485-86).

On January 24, 2017, Claimant was seen by Dr. Kandula with complaints of aching arms. (Tr. at 479). In regard to Claimant's hypothyroidism, Dr. Kandula noted that Claimant's THS levels were elevated, but her lipid profile was good. (*Id.*). Claimant's physical examination revealed normal findings. (Tr. at 480). On February 4, 2017, Claimant was seen by Ajay Kottapalli, M.D., for complaints of achilles tendinitis. (Tr. at 578). Dr. Kottapalli prescribed ibuprofen and therapy for treatment. (Tr. at 580).

### *B. Evaluations and Opinions*

On November 30, 2010, Catherine Van Verth Sayre, M.A., performed a mental status examination ("MSE") of Claimant. (Tr. at 367). Claimant was described as being cooperative with appropriate grooming and hygiene. (*Id.*). She reported that she did not feel like doing anything, and, although she would not go through with it, she contemplated suicide. (*Id.*). Claimant was oriented in all four spheres. She had a depressed mood and restricted affect, but her thought process and judgment were within normal limits. Claimant's immediate and remote memory was within normal limits, although her recent memory was impaired as reflected by her inability to recall two of four words after a five-minute delay. Claimant's concentration was mildly impaired; however, her persistence, pace, and social functioning were all within normal limits. (Tr. at 368). Claimant reported that she had a few friends whom she saw once or twice a week, but she spent most of her time alone. (Tr. at 369). She was able to keep her apartment clean, do her own shopping, and pay her bills. Ms. Van Verth Sayre diagnosed Claimant with major depressive disorder single episode, severe, and arthritis. (*Id.*). Claimant's prognosis was fair. (*Id.*).

On January 10, 2011, Claimant was seen by Dr. Rakesh Wahi, M.D., for a consultative physical examination. (Tr. at 370). Claimant described difficulty moving her left arm, pain in her back that limited her ability to bend and lift objects heavier than 20 pounds, and an inability to sit or stand for longer than two hours at a time. (*Id.*). Claimant indicated, however, that she was able to do housework and carry out normal daily activities. (*Id.*). On examination, Claimant's respiration was normal at rest; her chest was bilaterally symmetric; and she displayed normal respiratory excursion with no rales or rhonchi. (Tr. at 372). Claimant had a normal gait and could get on and off the examination table without difficulty. (*Id.*). Claimant exhibited normal sensation to touch, pressure,

and vibration bilaterally. She had normal reflexes bilaterally and a normal range of motion in her shoulders, elbows, wrists, hips, knees, and ankles bilaterally. (*Id.*). Claimant could fully extend both hands. Her upper and lower extremity strength, including her grip strength, was 5/5 bilaterally. Her fine manipulation was intact. (*Id.*). Claimant further showed normal flexion of the spine at the cervical and thoracic levels, as well as a normal range of motion of the cervical and lumbar spine, with normal straight-leg raising tests. (Tr. at 373). Dr. Wahi's diagnoses included arthritis and possible early acromegaly.[2] (*Id.*). Dr. Wahi believed Claimant showed "some decrease in her ability to stand for longer than two hours at a time." (*Id.*). Dr. Wahi also stated that Claimant was limited in her ability to lift more than fifteen pounds with her left arm; however, she retained normal abilities in her right arm. Dr. Wahi opined that Claimant was capable of performing all the activities of day-to-day living. (*Id.*).

On January 12, 2015, Claimant arrived at Tri-State Occupational Medicine, Inc. for a disability evaluation that was to be performed by Stephen Nutter, M.D. (Tr. at 418). Claimant's vital signs were taken by Dr. Nutter's assistant, but before she could be seen by Dr. Nutter, she left the hospital. (*Id.*).

On January 8, 2015, William Steinhoff, M.A., performed an MSE of Claimant. (Tr. at 410). Mr. Steinhoff reported that Claimant's grooming was poor, with mild body odor noted. (*Id.*). Claimant reported suffering from depressed thoughts, apathy, and difficulty sleeping. (Tr. at 411). During the examination, she displayed fair eye contact and clear speech. (Tr. at 412). Her mood was depressed and her affect was restricted. Claimant was

---

[2] **Acromegaly is "an** abnormal enlargement of limbs, caused by hypersecretion of growth hormone after maturity." Dorland's Medical Dictionary for Health Consumers. © 2007 by Saunders, an imprint of Elsevier, Inc.

oriented in all spheres and her thought process was slow but coherent. (*Id.*). Claimant's thought content was normal; she did not appear to be suffering from hallucinations or illusions; her insight was limited to fair; and her judgment was adequate or average. (*Id.*). Claimant's immediate and remote memory was within normal limits, but her recent memory was again noted to be moderately deficient, and her concentration was moderately impaired. (Tr. at 413). Her verbal abstract reasoning was adequate. (*Id.*). Claimant exhibited mild impairment in her general fund of knowledge; for example, she was able to identify the purpose of a thermometer and how many seconds were in a minute, but could not remember in what direction the sun rose, or how many weeks were in a year. (*Id.*). Claimant's processing speed was slow and psychomotor retardation was observed. (*Id.*).

Mr. Steinhoff assessed Claimant's pace as moderately slow, her persistence as mildly impaired, and her social functioning as mildly impaired secondary to her depressed mood. (*Id.*). Mr. Steinhoff felt that Claimant was "rather vague" in describing her typical day, although she reported straightening up the house, helping her roommate, and watching television as daily activities. (*Id.*). Claimant performed personal care two or three times a week, cleaned the house two to three times a week, did laundry once a week, washed the dishes, and prepared food with the help of a friend. (*Id.*). Mr. Steinhoff assessed Claimant with major depressive disorder, which was recurrent, moderate, and chronic. Her prognosis was guarded. (Tr. at 413-14).

On March 3, 2015, state agency physician, Hedy Mountbatten-Windsor, M.D., reviewed Claimant's applications for disability at the initial level. (Tr. at 79). Dr. Mountbatten-Windsor opined that because "Claimant did not stay in her appointment with [the consultative examiner]," there was insufficient evidence to fashion a RFC or

assess Claimant's limitations. (*Id.*). State agency psychologist, Joseph Richard, likewise opined that there was insufficient evidence to assess Claimant's mental impairments prior to the date last insured. (Tr. at 80-81). However, Dr. Richard did believe there was sufficient evidence to create a Mental Residual Functional Capacity ("MRFC") assessment for Claimant's SSI claim. (Tr. at 81-83). Dr. Richard felt that the medical record showed Claimant to have some mild to moderate mental limitations; however, he believed Claimant retained the ability to complete work-like activity in a low-stress environment if limited to simple routine tasks with no production requirements and minimal contact with the public. (Tr. at 83). Dr. Richard did not believe Claimant was disabled. (Tr. at 84).

On June 2, 2015, Claimant was given a consultative examination by Robert Holley, M.D. (Tr. at 459). He found Claimant's chest to be slightly increased in anteroposterior diameter, and it was tympanic to percussion. (Tr. at 461). Claimant displayed no wheezing, rales, rhonchi, rubs, or retractions. Her diaphragmatic excursions were normal bilaterally, as were her breath sounds. (*Id.*). Claimant's musculoskeletal examination revealed tenderness to palpitation of both the lumbar spine and knees. She did not have any red, hot, or swollen joints. Claimant had clicking in both knees, but no locking. (*Id.*). Her anterior and posterior drawer sign and pivot shift were negative. Her gait was mildly antalgic bilaterally. (*Id.*).

With respect to her mental status, Claimant had a normal mood and affect; was oriented to time, person, and place; and had normal short and long-term memory capabilities. (*Id.*). Her sensation was symmetrical and within normal limits bilaterally. (*Id.*). Claimant had a somewhat limited range of motion in her extremities, with normal motor strength. (Tr. at 461-62). Her heel-to-toe walk was normal, and she achieved a 30% squat, which was limited by lumbar pain. (Tr. at 462). Claimant had normal fine

manipulation and could oppose her fingers, make a fist, and fully extend her hands (*Id.*). Dr. Holley diagnosed Claimant with obesity, chronic obstructive pulmonary disease, osteoarthritis of the knees and lumbar spine, hypothyroidism, eczema, polydipsia with nocturia, questionable diabetes or metabolic syndrome, iron-deficiency anemia, and depression and anxiety. (*Id.*).

On July 13, 2015, state agency physician, Pedro Lo, M.D., determined on reconsideration that there was insufficient evidence to assess Claimant's limitations prior to the date last insured. (Tr. at 107). However, with the benefit of Dr. Holley's examination, Dr. Lo was able to assess Claimant's current limitations and complete a Physical Residual Functional Capacity Assessment ("PRFC"). (Tr. at 109-10). Dr. Lo first determined that one or more of Claimant's medically determinable impairments could reasonably be expected to produce her symptoms. However, Dr. Lo did not believe that Claimant's statements about the intensity, persistence, and limiting effects of the symptoms were substantiated by the objective medical evidence. He thus rated Claimant's statements about functional activities as only "partially credible." (Tr. at 109).

Dr. Lo determined that Claimant could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and had unlimited ability to push and pull up to the weight limits Claimant could lift and carry. (Tr. at 110). Dr. Lo felt that Claimant had some postural limitations in that she could only occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; and could only occasionally balance, stoop, kneel, crouch, and crawl. (*Id.*). Dr. Lo felt that Claimant did have manipulative limitations as she was limited in her ability to reach front, laterally, and overhead with both the left and right arms. (*Id.*). Dr. Lo thought Claimant should avoid concentrated

exposure to extreme heat and cold, vibrations, and hazards. (Tr. at 111-12).

On reconsideration, state agency psychologist, Jeff Boggess, Ph.D., agreed with Dr. Richard's determination that there was insufficient evidence to assess Claimant's mental limitations prior to the date last insured. (Tr. at 108-09). Dr. Boggess additionally agreed with and affirmed Dr. Richard's assessment of Claimant's current mental limitations. (Tr. at 114).

### C. Claimant's Statements

On October 24, 2014, Claimant completed an Adult Function Report. (Tr. at 285-92). In the report, Claimant indicated that she had difficulty going up and down stairs and standing for long periods of time due to pain in her knees. (Tr. at 285). Claimant's arms would go numb and she had difficulty holding items. She also described suffering from depression with frequent crying and worrying. (*Id.*). Claimant prepared her own food, generally sandwiches, but would sometimes be too depressed to eat. She also revealed that she did laundry approximately once a week, but if feeling depressed, would neglect it. (Tr. at 287). Claimant went outside one to two times a week and shopped approximately once a month for necessities. (Tr. at 288). She mainly watched television and sewed. She occasionally visited friends, but was often too afraid to leave her apartment. (Tr. at 289). Claimant asserted that, if not reminded, she would forget to go to doctors' appointments. (*Id.*). Claimant completed a second Adult Function Report on April 30, 2015, which largely reflected the same limitations and activities. (Tr. at 303-10).

At the administrative hearing, Claimant testified that she experienced constant pain in her arms and frequently would drop items accidentally. (Tr. at 46-47). Perhaps once or twice a month she would experience days where she felt incapable of seeing or talking to anyone. (Tr. at 50). Claimant stated that she had maybe twenty bad days out of

a thirty-day month. (Tr. at 54). On a good day, she could perform household chores, but on a bad day, she did not want to do anything. (Tr. at 54-55). Claimant explained that she was employed by West Virginia Choice to help care for her roommate, who had cancer. (Tr. at 58). The job entailed cleaning the house, cooking for her roommate, doing laundry, and making sure her roommate took prescribed medications. (*Id.*). Claimant testified that her condition had deteriorated since 2011, making it impossible for her to work at a job where she had to sit for six hours out of an eight-hour workday, or stand for that amount of time. (Tr. at 64-65).

## VI.    **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of §

205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.    **Discussion**

As noted above, Claimant challenges the ALJ's analysis of various medical opinions and argues the decision is not supported by substantial evidence. Each argument is discussed below, in turn.

### A. Dr. Wahi's Opinion

Claimant offers a nebulous argument in support of her claim that the ALJ did not appropriately consider Dr. Wahi's opinion, saying merely that the ALJ erred by assigning only "partial weight" to his opinion as Dr. Wahi said that Claimant suffers from arthritis and possible acromegaly. (ECF No. 9 at 5). Claimant contends that this failure eroded the accuracy of both the ALJ's RFC determination and credibility assessment. (*Id.*).

When evaluating a claimant's application for benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). The regulations outline how the opinions of accepted

20

medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1).[3]

When considering the medical opinions of record, an ALJ should take into account the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, (5) whether the physician is a specialist, and (6) any other relevant factors. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96–2p, 1996 WL 374188 at *4. The ALJ must consider all the relevant factors when weighing a medical opinion, but need not explicitly discuss each factor. *See Hardy v. Colvin*, No. 2:13-CV-20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014).

"Medical source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance, 'because giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when

---

[3] Effective March 27, 2017, the SSA rescinded § 404.1527 and § 416.927 and implemented a new rule governing the consideration of medical opinions. *See* 20 C.F.R. § 404.1520c (2017). Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them based upon the two most important factors of supportability and consistency. §§ 404.1520c(a), (c)(1)–(2). Claimant completed her claim on October 20, 2014, before this regulation took effect. (Tr. at 234, 240). The Agency does not have the power to engage in retroactive rulemaking. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law); *see also* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulation does not have retroactive effect, the Court will review the ALJ's decision under the old rule codified by 20 C.F.R. § 404.1527 and 416.927.

an individual is disabled.'" *Reed v. Colvin*, No. 3:13-CV-4647, 2014 WL 554693, at *17 (S.D.W. Va. Feb. 12, 2014) (quoting SSR 96–5p, 1996 WL 374183, at *2). Generally, courts should not disturb an ALJ's decision as to the weight afforded to a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'" *Dunn v. Colvin*, 607 F. A'ppx. 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Ultimately, it is the responsibility of the ALJ, not the Court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *See Hays*, 907 F.2d at 1456. However, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. *See Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1994).

In this case, the ALJ discussed Dr. Wahi's opinion at length. Dr. Wahi believed that Claimant was capable of performing all the activities of day-to-day living, despite the fact that she had "some decrease in her ability to stand for longer than two hours at a time." (Tr. at 373). Dr. Wahi also stated that Claimant was limited in her ability to lift more than fifteen pounds with her left arm, although she retained normal abilities in her right arm. (*Id.*). Dr. Wahi listed his diagnoses as arthritis and possible early acromegaly. (*Id.*). The ALJ believed that Dr. Wahi's assessment of Claimant's abilities was "synonymous with [his] physical examination of the claimant which was mostly normal." (Tr. at 18-19). However, as Claimant's condition had deteriorated since the examination in 2011, the ALJ decided to assign Dr. Wahi's opinion "partial weight." (Tr. at 19).

Claimant faults the ALJ for assigning "only" partial weight to Dr. Wahi's opinion due to his diagnoses of arthritis and possible acromegaly. (ECF No. 9 at 5). While Claimant does not explicitly specify the manner in which the ALJ erred, Claimant's wording implies that she feels the ALJ assigned too *little* weight to Dr. Wahi's opinion.

However, as the ALJ noted, Dr. Wahi's physical examination revealed relatively benign findings, and his RFC opinion was that Claimant was able to lift up to fifteen pounds with her left arm and had "normal" ability to lift and work with the right arm. (Tr. at 373). Considering that Dr Wahi's opinion was *less* restrictive than the ALJ's RFC finding—which provided that Claimant could do light work, but was only occasionally capable of reaching with both arms—it is unlikely that giving greater weight to Dr. Wahi's opinion would have resulted in a more favorable outcome for Claimant.

To the extent that Claimant's argument rests on Dr. Wahi's diagnoses of arthritis and possible acromegaly, the argument lacks merit. Claimant suggests that these diagnoses compelled the ALJ to find further functional limitations. It is well established, however, that a diagnosis alone is insufficient to establish the severity of an impairment; rather, "[t]here must be a showing of related functional loss." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986); *see also Ramsey v. Berryhill*, No. 5:17-CV-01374, 2019 WL 1472411, at *6 (S.D.W. Va. Mar. 12, 2019), *report and recommendation adopted*, No. 5:17-CV-01374, 2019 WL 1461914 (S.D.W. Va. Apr. 2, 2019) ("[An impairment] is not necessarily disabling. There must be a showing of related functional loss.") (quoting *Gross,* 785 F.2d at 1166). Accordingly, it is not enough to merely point to a medical diagnosis in order to establish disability. Instead, Claimant must also show how that condition results in actual functional limitation. The ALJ considered Dr. Wahi's report, including his diagnoses, and determined that additional evidence of record showed Claimant to be more limited than Dr. Wahi concluded in his RFC opinion. (Tr. at 18-19). The fact that Dr. Wahi attributed less functional limitation to his diagnoses than the ALJ certainly undermines Claimant's contention that the same diagnoses should have compelled limitations more restrictive than those included in the RFC finding.

Accordingly, the undersigned **FINDS** that the ALJ appropriately considered Dr. Wahi's opinion, and Claimant's argument that, in view of the diagnoses, the ALJ erred in weighing the opinion lacks merit.

### B. Dr. Holley's Opinion

Claimant contends that the ALJ erred when she failed to state what weight she afforded to the opinion of Dr. Holley, who performed a consultative examination of Claimant on June 2, 2015. (ECF No. 9 at 5; Tr. at 459). Claimant lists a number of examination findings by Dr. Holley in support of her argument. (ECF No. 9 at 5). The Commissioner responds that the ALJ was not required to state what weight she gave to Dr. Holley's findings because they did not represent an "opinion" for purposes of disability determination. (ECF No. 11 at 14).

The Commissioner is correct that Claimant's argument conflates examination findings with a "medical opinion" as that term is used by the SSA. A "medical opinion" is a term of art employed by the SSA and subjects the ALJ to certain analytical requirements under 20 C.F.R. §§ 404.1527(c) and 20 C.F.R. § 416.927(c). Under SSA regulations governing Claimant's application at the time of the decision, a "medical opinion" is defined as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1), 20 C.F.R. § 416.927(a)(1). Dr. Holley's consultative examination contained only clinical findings and never expressed any judgment "about the nature and severity" of Claimant's impairments, nor did he make any statements regarding what activities Claimant could "still do despite [her] impairment(s)." (Tr. at 459-462); 20 C.F.R. § 404.1527(a)(1), 20 C.F.R. § 416.927(a)(1).

24

The regulations also distinguish treating source opinions from "objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2), 20 C.F.R. § 416.927(c)(2).

Courts in the Fourth Circuit have recognized the distinction between medical record evidence, which consists of bare objective findings, and medical opinion evidence, which reflects a professional judgment as to the nature of a claimant's impairments. *See Love-Moore v. Colvin*, No. 7:12-CV-104-D, 2013 WL 5366967, at *11 (E.D.N.C. Aug. 30, 2013), *report and recommendation adopted*, No. 7:12-CV-104-D, 2013 WL 5350870 (E.D.N.C. Sept. 24, 2013), *aff'd sub nom.*, 584 F. App'x 155 (4th Cir. 2014) ("Only those statements within the records that reflect judgments regarding a claimant's prognosis or limitations, or the severity of symptoms, constitute medical opinions.") (citing *McDonald v. Astrue*, 492 F. App'x 875, 884 (10th Cir.2012)); *see also Sellers v. Colvin*, No. 4:15-CV-38, 2017 WL 599423, at *12 (W.D. Va. Jan. 24, 2017), *report and recommendation adopted*, No. 4:15-CV-00038, 2017 WL 598504 (W.D. Va. Feb. 14, 2017) (treatment notes were not a medical opinion where "[t]here is no indication that the portion of the record in question reflects Dr. Morris's judgment of [the claimant's] functional abilities."); *Bentley v. Colvin*, No. 5:15-CV-79, 2016 WL 8116791, at *19 (N.D.W. Va. June 2, 2016), *report and recommendation adopted*, No. 5:15CV79, 2016 WL 3963039 (N.D.W. Va. July 22, 2016) (statement was not a medical opinion where it "does not reflect a judgment regarding the severity of [the claimant's] symptoms or describe what [the claimant] can still do despite her impairments. It does not even reflect that [the claimant] is restricted from performing any activities due to her treatment. Therefore, the statement does not qualify as a medical opinion."). Additionally, a terse statement listing diagnoses is generally not seen as constituting a medical opinion absent additional information

25

regarding the nature and severity of the impairments, or the resulting functional restrictions caused by the diagnoses. *Compare Hitchens v. Colvin*, No. 7:13-CV-40-FL, 2014 WL 6977765, at *3 (E.D.N.C. Dec. 9, 2014), *aff'd*, 627 F. App'x 238 (4th Cir. 2015) (reports containing brief diagnoses were not medical opinions as they did not "provide any conclusions as to [the claimant's] abilities, limitations, or how long [the claimant's] impairments can be expected to last."); *Phillips v. Colvin*, No. 3:13-CV-00307-MOC, 2014 WL 1713788, at *6 (W.D.N.C. Apr. 30, 2014) (note with a diagnosis was not a medical opinion as it did not "contain any medical conclusion or opinion concerning the impact of such diagnosis—either by expressing an opinion as to the impact on plaintiff's ability to do work-related activities or perform daily activities."), *with Rouse v. Berryhill*, No. 6:16-1089-DCN, 2017 WL 4348560, at *5 (D.S.C. Sept. 29, 2017)(form containing diagnosis was a medical opinion as it "expound[ed] upon the 'physical and mental restrictions'" of the claimant and "discuss[ed] the extent of her ability to engage in society normally.").

Generally, consultative examinations should contain "a medical opinion as part of the consultative examination process." *See Hill v. Berryhill*, No. CV CBD-17-3707, 2019 WL 280270, at *7 (D. Md. Jan. 22, 2019). However, SSA regulations expressly provide that, "the absence of a medical opinion in a consultative examination report will not make the report incomplete." 20 C.F.R. § 404.1519n(c)(6); *see also Hill,* No. CV CBD-17-3707, 2019 WL 280270 at *7 (absence of a medical opinion in consultative examination did not invalidate the examination). While Dr. Holley's examination did include objective medical findings and a list of diagnoses, the examination did not contain any of the hallmarks of a medical opinion, as he included no discussion regarding the severity of Claimant's impairments, an expected prognosis, or the extent to which the impairments

26

eroded her ability to partake in physical activity. (Tr. at 462). Accordingly, the ALJ was not required to weigh the results of Dr. Holley's consultative examination in the same manner as a medical opinion.

In any event, the ALJ did analyze Dr. Holley's findings extensively when assessing Claimant's RFC. (Tr. at 17-18). The ALJ furthermore incorporated Dr. Holley's findings into the RFC, as the ALJ stated she assigned "great weight" to the opinion of state agency physician, Dr. Lo, who used Dr. Holley's consultative examination findings to create Claimant's PRFC. (Tr. at 19). The ALJ felt Dr. Lo's assignment of Claimant to the light level work, with several postural and other limitations, adequately incorporated her impairments as established by the medical record. (*Id.*).

Dr. Holley's objective medical findings did not constitute a medical opinion as defined by the SSA; thus, the undersigned **FINDS** that the ALJ appropriately considered and analyzed the findingsalt and explicitly assigned weight to the opinion of the state agency physician who incorporated those findings.

### C. Mr. Steinhoff's Opinion

Claimant argues that the ALJ erred when she did not state what weight she assigned to the opinion of Mr. Steinhoff, who performed an MSE of Claimant in January 2015. (ECF No. 9 at 5-6; Tr. at 410). Claimant points out that Mr. Steinhoff assessed Claimant with major depressive disorder, found mild psychomotor retardation, and issued a "guarded" prognosis. (ECF No. 9 at 6). The Commissioner again argues that Mr. Steinhoff's findings did not represent a "medical opinion" and, as such, the ALJ was not required to explicitly review their import. (ECF No. 11 at 16-17).

As noted above, a diagnosis is neither necessarily a "medical opinion" for the purposes of disability review, nor does it compel a finding of limitations if it lacks further

explanation regarding the limiting effects of the diagnosis. Mr. Steinhoff's consultative examination consists largely of objective medical findings unaccompanied by further analysis; although, it does include some discussion of the nature of Claimant's impairments. Mr. Steinhoff's consultative examination report concludes with a "diagnostic rationale," which explains that the diagnosis of depression was based on self-reports by Claimant as well as observations made during the evaluation. (Tr. at 414). Mr. Steinhoff summarized the results of his MSE as revealing that, in addition to Claimant's self-reports of depression and crying, her "speech and thought process were slow in rate." (*Id.*). Mr. Steinhoff observed "mild psychomotor retardation" and impairment in Claimant's recent memory, attention, and concentration. (*Id.*). He assessed her mood as depressed with restricted range of affect. Claimant's grooming was poor, and body odor was noted. The report states that Claimant's prognosis was "guarded," and it contains some indication of the impact of Claimant's limitations, saying she "would be capable of maintaining her own finances on at least a basic level," if awarded benefits. (*Id.*).

This consultative examination report does contain marginally more analysis than that reflected in the report of Dr. Holley. The report speaks in general terms about the severity of Claimant's symptoms and functional difficulties, but it does not include any clear indication of how these impairments limited Claimant's ability to perform tasks or interact with others on a day-to-day basis. While Mr. Steinhoff's consultative examination report consists largely of clinical findings, the inclusion of diagnoses, a prognosis, and an explanation of the basis for the diagnoses, makes Claimant's argument that the report is a "medical opinion" for the purposes of SSA review more convincing.

However, even if Mr. Steinhoff's consultative examination report is considered a "medical opinion," the ALJ adequately addressed the opinion in her decision. The ALJ

discussed Mr. Steinhoff's examination at length when explaining the RFC determinations,

summarizing the encounter as follows:

> The claimant had an examination with psychologist William Steinhoff in January of 2015 and her eye contact was fair. Her speech was clear, coherent, and relevant, but was slow in rate. She was oriented in all spheres. Her mood was depressed. Her affect was restricted in range. Her thought process was slow and coherent. Her judgment appeared adequate or average. Her immediate memory was within normal limits. She was able to recall four out of four items immediately after they were verbally presented. Her recent memory was moderately deficient. She recalled only two of the four items after five-minute time lapse. Her remote memory appeared within normal limits. She was able to recall historical information without difficulty. Her concentration appeared moderately impaired. She could not perform serial sevens or serial threes. She was only able to recall up to six digits forward and only five digits backward for the Digit Span. Her pace was moderately slow. Her persistence was mildly impaired based on her interaction during the evaluation. Her social functioning was mildly impaired secondary to a depressed mood. The claimant was diagnosed with depressive disorder.

(Tr. at 17). The ALJ additionally explicitly discussed Mr. Steinhoff's examination during

her analysis of Dr. Boggess's opinion. (Tr. at 19). The ALJ stated she placed "great weight"

on the opinion of Dr. Boggess, who affirmed the decision of Dr. Richards. (Tr. at 19, 108).

The ALJ noted that while Dr. Boggess felt Claimant did have a severe affective disorder,

he believed she possessed the "residual functional capacity to complete work-like activity

in a low stress work environment, on simple routine tasks, with no production

requirement, with minimal contact with the public that makes accommodations for any

physical limitations." (Tr. at 19). The ALJ felt that this assessment was "consistent with

the treatment that the claimant has received for her depression." (*Id.*). The ALJ noted that

this was also consistent with Mr. Steinhoff's consultative examination findings, indicating

that the level of limitation assigned by Dr. Boggess was "compliant with the consultative

examination by Mr. William Steinhoff which noted the claimant's social functioning was

limited and her thought process was slow." (*Id.*).

29

"Generally, an ALJ must explicitly state the weight given to all relevant evidence, including medical source opinions." *Wade v. Colvin*, 2013 WL 1621971, at *3 (M.D.N.C. April 15, 2013), (citing *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984)). However, this Court, and other district courts in this circuit, have often "denied remand where the weight given to an opinion by the ALJ can be ascertained and the omission was harmless." *Nolen v. Colvin*, No. 3:12CV571-GCM-DCK, 2014 WL 65355, at *7 (W.D.N.C. Jan. 8, 2014); *see also Chaney v. Berryhill*, No. CV 15-12556, 2017 WL 1197829, at *7 (S.D.W. Va. Mar. 31, 2017) (remand not necessary where clear ALJ considered treating physician opinion); *Thomas v. Comm'r, Soc. Sec.,* No. CIV. WDQ-10-3070, 2012 WL 670522, at *7 (D. Md. Feb. 27, 2012) ("Implicit assignments of weight can support meaningful review."). While the ALJ apparently did not consider Mr. Steinhoff's consultative report to be a medical opinion, requiring her to explicitly assign it weight, she *implicitly* gave Mr. Steinhoff's reported findings significant credence when she assigned great weight to the MRFC created by Dr. Boggess in part because it was consistent with the findings contained in Mr. Steinhoff's report. (Tr. at 19). The ALJ clearly considered Mr. Steinhoff's report and found it credible and consistent with Dr. Boggess's opinion, which itself relied on and incorporated Mr. Steinhoff's MSE findings. (Tr. at 83, 108). Additionally, the ALJ considered Mr. Steinhoff's consultative examination findings at length when fashioning Claimant's RFC. (Tr. at 17).

Therefore, even if the undersigned were to agree with Claimant's assertion that Mr. Steinhoff's consultative examination findings constituted a "medical opinion" that should be weighed, it would be apparent from the ALJ's decision that she considered and weighed the examination findings. (Tr. at 15, 19). Because the ALJ clearly analyzed Mr. Steinhoff's report and found it consistent with other opinions in the record, as well as with the

limitations included in the RFC, remand is unnecessary. *See Tanner v. Comm'r of Soc. Sec.*, 602 F. App'x 95, 100 (4th Cir. 2015) ("Our review of the ALJ's opinion, and of the medical record, demonstrates that the ALJ failed to expressly assign weight to a physical Medical Source Statement completed by Dr. LeBlond in January 2012. However, this error is harmless because it is clear from the ALJ's RFC assessment that he accepted most of Dr. LeBlond's findings.").

Accordingly, the undersigned **FINDS** that the ALJ did not err by failing to explicitly state what weight she afforded the consultative examination performed by Mr. Steinhoff because, even assuming the report was a medical opinion, the ALJ appropriately analyzed the report and implicitly gave it significant weight.

### D. Ms. Van Verth Sayre's Opinion

Claimant argues that the ALJ committed reversible error when she failed to state what weight she gave to the opinion of Ms. Van Verth Sayre, who performed a consultative examination of Claimant on November 30, 2010. (ECF No. 9 at 6; Tr. at 367). Claimant emphasizes that Ms. Van Verth Sayre diagnosed Claimant with major depressive disorder, single episode, severe, and indicated her prognosis was "fair." (ECF No. 9 at 6). The Commissioner, as above, argues that Ms. Van Verth Sayre's consultative examination report was not a "medical opinion" as defined by the SSA and additionally notes that the examination was performed during the period previously adjudicated by the SSA, which the ALJ explicitly stated she would not consider. (ECF No. 11 at 16 n.7).

Ms. Van Verth Sayre's MSE of Claimant revealed largely normal findings other than Claimant's depressed mood and restricted affect, moderately impaired recent memory, and mildly impaired concentration. (Tr. at 368). As in Mr. Steinhoff's report, Ms. Van Verth Sayre does not include any further analysis of the severity of Claimant's

impairments, or her ability to function beyond a cursory statement that Claimant "is capable of managing her own benefits." (Tr. at 369). In the "diagnostic rationale" Ms. Van Verth Sayre says only "[t]he diagnosis of Major Depressive Disorder is given because of depressed mood, hopelessness, poor sleep, decreased appetite with weight loss, feeling tired and thoughts of death." (*Id.*). Ms. Van Verth Sayre indicated that she believed Claimant's prognosis was "fair." (*Id.*).

The ALJ did not expressly address Ms. Van Verth Sayre's findings or diagnosis of depression. Nevertheless, the failure to do so constituted, at most, harmless error.[4] The ALJ did accept that Claimant suffered from depression and that it was a severe impairment. (Tr. at 13). Additionally, the ALJ considered the effect of Claimant's severe mental impairments, both when considering whether she met a listing, and when creating her RFC. (Tr. at 14-19). In so doing, the ALJ relied on the consultative examination performed by Mr. Steinhoff, as well as the opinion of Dr. Boggess. (Tr. at 17, 19). Mr. Steinhoff's assessment of Claimant's mental condition was bleaker than that reflected in Ms. Van Verth Sayre's report. Mr. Steinhoff's examination revealed more impairments in Claimant's mental functioning and his prognosis was "guarded" rather than "fair." (Tr. at 412-14). Moreover, Dr. Boggess opined that Claimant suffered from a "severe affective disorder," and the ALJ adopted that conclusion in the RFC. (Tr. at 19).

Claimant argues that the ALJ erred because she did not discuss and weigh Ms. Van Verth Sayre's diagnosis of depression. (ECF NO. 9 at 6). However, as the ALJ

---

[4] In social security cases, an ALJ's errors are harmless so long as the ALJ's conclusion is supported by substantial evidence in the record and the claimant could not reasonably have been prejudiced by the error. *See Tanner*, 602 F. App'x at 100; *see also Austin v. Astrue*, No. 7:06–CV–00622, 2007 WL 3070601, *6 (W.D.Va. Oct. 18, 2007) (holding that "[e]rrors are harmless in Social Security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.") (citing *Camp v. Massanari*, 22 Fed. App'x 311 (4th Cir.2001)).

acknowledged Claimant's diagnosis of depression, Claimant fails to show any prejudice from the alleged error. Ms. Van Verth Sayre's examination report contained no evidence of impairment or limitation that was not already in the record and discussed by the ALJ. Therefore, any error in failing to address Ms. Van Verth Sayre's findings was harmless.

Accordingly, the undersigned **FINDS** that the ALJ's failure to comment on Ms. Van Verth Sayre's consultative report does not provide grounds for a reversal or remand of the Commissioner's decision.

### E. Substantial Evidence Supporting Subjective Symptom Analysis

Claimant argues that the ALJ erred by determining that Claimant's allegations regarding the persistence and severity of her disability were not entirely consistent with the medical record. (ECF No. 9 at 6). Claimant believes that this determination is "without merit in light of the evidence of record including the findings of the consulting examining physicians and consulting examining psychologists previously referred to herein." (*Id.*). The Commissioner disagrees, contending that the ALJ provided a "thorough evaluation of the relevant portions of the record" and arguing that Claimant's "underdeveloped" argument to the contrary does nothing to refute the ALJ's well-reasoned findings. (ECF No. 11 at 17-19).

Pursuant to 20 C.F.R. §§ 404.1529, 416.929, the ALJ evaluates a claimant's report of symptoms using a two-step method. First, the ALJ must determine whether the claimant's medically determinable physical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. 20 C.F.R. §§ 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016).

Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *Id.* §§ 404.1529(c)(2), 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3); *see also*

34

*Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) A longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

> In *Hines v. Barnhart*, the Fourth Circuit stated that:
>
> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the

evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ clearly performed the two-step process. The ALJ noted that Claimant alleged she was unable to work due to a variety of physical ailments as well as depression and anxiety. (Tr. at 16). Ultimately, after considering the subjective and objective evidence, the ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. at 18). However, the ALJ found that Claimant's statements concerning the intensity, persistence,

and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record" for several reasons. (*Id.*).

First, the ALJ considered Claimant's reported activities, noting that she was able to "handle her personal grooming independently," and "prepare a simple meal for herself and her friend." (*Id.*). Claimant could do laundry and use public transportation. She could shop for groceries and manage her own finances. Claimant watched television and sewed for recreation. (*Id.*). "Most notabl[e]," according to the ALJ, was Claimant's employment with West Virginia Choice, which required her to care for her roommate "including cooking, light housework and cleaning the dishes." (*Id.*). The ALJ felt that Claimant's ability to do these activities, "undermine[d] the veracity of her allegations" that she was unable to work. (*Id.*).

As previously noted, the ALJ also considered at length the opinions of Dr. Wahi, Dr. Lo, and Dr. Boggess. (Tr. at 18-19). The ALJ assigned "great weight" to the opinions of Dr. Lo and Dr. Boggess, who both believed Claimant remained capable of performing work. (Tr. at 19). In addition, the ALJ extensively considered the medical record when assessing Claimant's RFC. (Tr. at 15-18). The ALJ considered a number of medical findings such as x-rays and physical examinations that suggested relatively minor impairments. (Tr. at 17-18). The ALJ noted that in February 2014, a physical examination at Holzer Health Systems revealed Claimant had full range of motion of the shoulders, bilateral elbows, wrists, and hands. (Tr. at 17). The ALJ thought it significant that "[x]-rays taken of the elbows did not reveal any bony abnormalities other than some early arthritic changes." (*Id.*). The ALJ also considered an examination of Claimant by Dr. Serfontein which revealed no abnormal findings. (*Id.*). As noted above, the ALJ gave attention to the examinations conducted by Dr. Holley and Mr. Steinhoff. (Tr. at 17-18).

37

The ALJ pointed out that in several visits from 2015-2017, Claimant's respiratory system showed "no increased work of breathing or signs of respiratory distress." Claimant's "lungs were clear to auscultation bilaterally" in these visits. (Tr. at 18). The ALJ also commented that throughout this time period, numerous medical health professionals assessed normal mental status and mood. (Tr. at 17-18).

Beyond citing to consultative examination findings, Claimant does not take issue with the ALJ's characterization of any of the above medical record, nor does Claimant reference anything in the record that contradicts the ALJ's analysis of the medical record. (ECF No 9 at 6). Instead, Claimant simply asserts that the medical record refutes the ALJ's determination. Claimant's failure to provide any indication of how she believes the record undermines the ALJ's determination frustrates effective judicial review. *See Young v. Astrue*, No. 1:09CV1008, 2013 WL 474787, at *4 n.6 (M.D.N.C. Feb. 7, 2013) (the claimant "points to no specific evidence of record that the ALJ failed to discuss that might have led the ALJ to formulate a more restrictive RFC, much less find her disabled.") *see also Miles v. Astrue*, No. C.A. 8:07-3164-RBH, 2009 WL 890651, at *14 (D.S.C. Mar. 30, 2009) (the claimant failed to specify how allegedly ignored evidence would affect the ALJ's decision); *Carroll v. Colvin*, No. CV 15-687-JWD-RLB, 2016 WL 7757275, at *3 (M.D. La. Dec. 29, 2016), *report and recommendation adopted*, No. CV 15-687-JWD-RLB, 2017 WL 151393 (M.D. La. Jan. 13, 2017) (claimant's blanket statement that the record revealed ALJ's decision was not supported by substantial evidence frustrated meaningful judicial review); *McCall v. Astrue*, No. 2:10CV013, 2011 WL 5974365, at *5 (W.D.N.C. Nov. 29, 2011) (denying claim where the claimant did "not cite any authority or present any significant analysis of this issue.").

By simply stating that the ALJ's analysis was insufficient without any further

38

explanation, Claimant is asking this Court to scour the record in order to find conflicting evidence and then re-weigh the evidence in order to come to a conclusion contrary to that of the ALJ. (ECF No. 9 at 6). However, those tasks are not part of the role that this Court plays in reviewing the ALJ's decision. *Hays*, 907 F.2d at 1456. The Court "must sustain the ALJ's decision, even if [it] disagree[s] with it, provided the determination is supported by substantial evidence." *Sims v. Colvin*, No. 0:14-1663-MGL-PJG, 2015 WL 5525096, at *4 (D.S.C. Sept. 17, 2015) (quoting *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir.1996)).

The ALJ cited to substantial evidence that supported her decision. She noted opinions by state agency evaluators suggesting Claimant was capable of employment, activities and abilities retained by Claimant that were contrary to her assertion she was precluded from all work, and medical findings that suggested Claimant's condition was not as severe as alleged. (Tr. at 17-19). Given that the ALJ based her decision on more than a "mere scintilla" of evidence, and Claimant does not dispute the conclusions drawn from this evidence, or point to any contradictory evidence, the ALJ's decision is supported by substantial evidence. *Blalock*, 483 F.2d at 776.

Therefore, taken as a whole, the undersigned **FINDS** that substantial evidence supports the ALJ's subjective symptom analysis.

### F. Claimant Precluded from Employment

Finally, Claimant asserts that a "fair review of the evidence," would show that the combination of Claimants mental and physical limitations means she is precluded from "all substantial gainful activity." (ECF No. 9 at 6). Even more so than above, this argument lacks any articulation as to what aspect of the ALJ's analysis Claimant believes was incorrect. Simply stating that "fair review of the evidence" would lead to a conclusion that Claimant is disabled does not permit meaningful judicial review. The ALJ reached her

39

decision that Claimant was not precluded from all work after a review of the relevant evidence. The ALJ determined that Claimant was not entirely precluded from employment after determining that Claimant was capable of performing work at the light exertional level with some limitations and based this decision on substantial evidence. Claimant's argument, which points to no contradictory evidence or any failure in the ALJ's analysis, is not persuasive.

Therefore, taken as a whole, the undersigned **FINDS** that substantial evidence supports the ALJ's determination Claimant was not precluded from all employment.

## VIII.  **Recommendations for Disposition**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 9); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 11); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District

Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** May 2, 2019

Cheryl A. Eifert
United States Magistrate Judge